Filed 8/11/16  P. v. Parsley CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HOPETON PARSLEY et al.,<br><br>    Defendants and Appellants. | B264016<br><br>(Los Angeles County<br>Super. Ct. No. SA080993) |

APPEAL from judgments of the Superior Court of Los Angeles County, Mark E. Windham, Judge.  Affirmed, as modified, with directions.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant Hopeton Parsley.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant Kevin Green.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael C. Keller and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

By way of this appeal, Playboy Gangster Crip members Hopeton Parsley and Kevin Green challenge their criminal convictions. Both were convicted of the first degree murder of Oscar Duncan, a youth preacher, with no gang affiliation. Both reported the killing to their fellow gang member James. Both were observed by Nichole Sheran, who witnessed Green drive Parsley to the location of the murder, Parsley shoot Duncan, and Green drive away.

Green also was convicted of the second degree robbery of L.C., who was injured during the course of the robbery. (Parsley was not charged with the robbery.) At the time of the crimes, Green wore an ankle bracelet with global positioning system capability identifying his location, and it was undisputed that he was present at the scene of both the murder and the robbery.

Defendants raise numerous contentions, most of which lack merit, and none of which demonstrate that the reversal of their convictions is required. With minor revisions to Parsley's sentence and a minor correction to Green's abstract of judgment, the judgments are affirmed.

## FACTS

Defendants were members of the Playboy Gangster Crips (Playboys), along with their friend James. James, a Playboy member for 10 years, was known as Witit. James had been convicted of petty theft, assault with a deadly weapon, being a felon in possession of a firearm, and two counts of burglary. In order to secure his testimony at defendants' trial, James was relocated and his rent and meals were paid for by law enforcement for a short period of time.[1]

Nicole Sheran knew defendants and was in the car with them when Parsley shot and killed Duncan. Sheran was a member or affiliate of the Marvin Gangster Crips

---

[1] James initially was arrested for Duncan's murder, and testified that he decided to cooperate with police. James further testified that he stopped claiming Playboys around the time of this case.

2

(Marvins). Kershawn Washington[2] also was a Marvin and accompanied defendants and Sheran when Parsley shot Duncan. Washington was Sheran's boyfriend and pimp. The Marvins and the Playboys were friendly gangs.

James and Sheran testified that Green and Parsley were members of the Playboys. Green was known as Baby Skull and Parsley was known as Infant Skull or Infant. Sheran testified that a gang member has to earn his or her membership in the gang. She testified that working for the gang included shooting people and robbing people.

Green's girlfriend, Brittney, testified that Green was a gang member even though she did not personally observe him committing crimes. She was aware of both Green's and Parsley's monikers. Brittney owned a white Lexus, which Green often drove.

The Playboys' rivals included the Shoreline Crips, a Venice gang.

### 1. Robbery (Green)

On May 21, 2012, about 11:15 p.m., L.C. and his girlfriend M.S. were walking home from a liquor store. On their way home, they encountered two African-American men. (Both defendants are African-American.) One of the men asked L.C. where he was from and brandished a gun. The same man later said, "Well, this is for Playboys," and started to beat L.C. The two men continued assaulting L.C. until he temporarily lost consciousness. The men took L.C.'s cell phone, money, keys, and knife.

M.S. identified Green in a photographic lineup. L.C.'s phone was found in the apartment where Green and his girlfriend lived. Green's ankle bracelet identifying his location placed him at the scene of the robbery.

### 2. Murder (Green and Parsley)

On June 4, 2012, Green and Parsley dropped off Brittney at her apartment and left in the white Lexus Green and Brittney shared.

---

[2] The record shows Washington's first name spelled variously as Kirshawn or Kershawn.

3

Later that night, Duncan was shot and killed. Green was driving the white Lexus; Parsley, Sheran,[3] and Washington[4] were passengers. James testified that the four were "on a mission" that night to assault or kill rival gang members.

Green parked the Lexus close to Duncan's family residence. Duncan and his fiancée M.J. were in Duncan's car, which he had parked nearby. As M.J. walked from the car to Duncan's residence, Green called out to her. He said, "Hey, sexy," and "Hey, bitch." Either Sheran handed Parsley a gun or Parsley already had armed himself.[5] Green may have asked Parsley if he "ha[d] the burner," meaning the gun.

Shortly after M.J. walked to Duncan's residence, Duncan left his car and walked toward the residence. Parsley yelled, "Shoreline." Parsley's reference was to the Shoreline Crips gang and was "bait" to lure Shoreline gang members to admit their gang membership so that defendants could assault or kill them.

Duncan approached Green's vehicle and said that he lived in the neighborhood but was not a gang member. Parsley shot Duncan in the face.

Immediately after the shooting, defendants celebrated in their car as Green sped away from the crime scene.

Later, Green saw that there was blood on his car and smeared the blood with his shoe.

After killing Duncan, both Green and Parsley described the circumstances of the killing to James. A day or two after the killing, Green told James that he was driving; they pulled up near Duncan and "banged 'Sholine Crip' " (*sic*), which meant someone

---

**3** Sheran pled guilty to one count of manslaughter. Sheran testified that she worked as a prostitute. She also testified that she lied several times to police officers. Additionally, she acknowledged that she had smoked marijuana the night of the murder. Sheran also testified that she sold drugs with James. Jurors were instructed that Sheran was in custody when she testified.

**4** At the time of defendant's trial, Washington was awaiting trial for murder. Washington did not testify.

**5** James testified that Sheran told him she gave the gun to Parsley prior to the Duncan shooting. In contrast, Sheran testified that Parsley already had the gun.

4

said "Shoreline Crip." Green told James that "Infant," meaning Parsley, was the shooter. Sheran also told James that Parsley was the shooter. Parsley told James that prior to the shooting, Duncan had said "he didn't bang," meaning that he was not a gang member. Parsley confirmed Green's version of events when he spoke to James.

At trial, M.J. identified Parsley as similar to the shooter, but it was undisputed she had neither selected his photograph in a pretrial six-pack nor identified him in a live lineup. M.J. identified a photograph of Green's vehicle.

Sheran testified that she observed Parsley shoot Duncan. She also testified that Duncan was very close to the car when Parsley shot him, but did not know Parsley would shoot Duncan. Sheran further testified that defendants went to Venice to confront rival gang members.[6]

### 3. Clemson Street Shooting (Uncharged Conduct)

Shortly after the Duncan murder, a shooting occurred on Clemson Street. Just prior to the shooting, someone yelled, "Playboy gangsters." A witness saw a white sedan. The shooting left bullet holes in multiple apartments. J.A. testified that Parsley had fought with someone living in the bullet-infested apartment building a few days earlier.

### 4. Gang Evidence

As noted, several lay witnesses testified about gangs and defendants' gang membership. James (the Playboy member or former member) testified about Green's and Parsley's gang membership. He further explained the meaning of a "mission" and putting in work for a gang. Similarly Sheran, a gang affiliate, testified as to Green and Parsley's gang membership. Sheran testified that work for the gang meant shooting people and robbing people. Brittney, Green's girlfriend, testified about Green's gang membership, and Parsley's neighbor testified that Green was a gang member.

In addition to the lay witnesses, Sergeant Armando Arenas testified as a gang expert. Within the Los Angeles Police Department, he was the primary officer

---

[6] The testimony is from the preliminary hearing, but it was introduced at trial.

responsible for monitoring the Playboys and often encountered them on the street. He had been trained by a more senior officer. Arenas regularly made contact with Playboy members. In June 2012, there were approximately 130 Playboy members. Arenas testified that gang members earn respect by committing crimes. "Putting in work" meant committing crimes to benefit the gang. The Playboys' primary activities were robberies, witness intimidation, pimping, shootings, and possession of firearms. Gang members used monikers to conceal their identity. Consistent with James's and Sheran's testimony, Arenas testified that Green's moniker was Baby Skull and Parsley's moniker was Infant Skull.

Sergeant Arenas was familiar with Green, having encountered him several times. Green admitted his gang membership, and it was documented on field interview cards maintained by the police department. Arenas personally saw Green's tattoos including a Playboy bunny on his chest. Green also had a "P" tattooed on his right arm and on the side of his neck. Parsley also bore tattoos reflecting his gang membership. Sergeant Arenas completed a field identification card for Parsley, which along with others indicated that Parsley's gang status was known. Arenas opined that both Green and Parsley were active gang members.

Sergeant Arenas also testified consistent with James and Sheran regarding which gangs were rivals and which were friendly. Most significantly, Arenas testified that the Playboys and Shoreline Crips were rival gangs. It therefore would be unsafe for members of Playboys to drive into a Shoreline Crips neighborhood. When in rival gang territory, Playboys could be assaulted or killed. When asked a hypothetical question with facts similar to this case, Arenas opined that the murder was committed for the benefit of the gang and in association with other gang members.

Officer Michael Boyle also testified as a gang expert. According to him the Marvins shared the same rivals as the Playboys. He (like Sheran) testified that Washington (Sheran's boyfriend) was an active member of the Marvins. Boyle testified that he had personally interviewed Washington, and other officers had interviewed Washington in the field. Based on his personal interactions with Sheran and the

interactions of other officers with her, Boyle opined that Sheran was a member of the Marvins.

## 5. *Defense*

No witness testified for the defense.

Parsley's counsel argued that the primary witnesses were not credible and emphasized that James and Sheran had entered deals with the prosecution. Counsel pointed out that James had been convicted of numerous felony offenses and that he initially was arrested for the Duncan murder, and received relocation expenses, rent and other expenses. Counsel argued that Sheran "[s]truck a deal" for manslaughter and then repeatedly lied about the case. Counsel argued no one confirmed Parsley's conversation with James. Counsel argued that M.J.'s identification of Parsley was leading and suggestive, pointing out that she identified someone else prior to trial. Counsel argued "[M.J.] was presented with a line-up of one." Counsel emphasized the jury instruction on eyewitness identification, pointing out that M.J. did not have contact with Parsley before the shooting, she could not see well because it was nighttime and she was nearsighted. Counsel also argued that significant time passed since the shooting and the in-court identification.

Green's counsel conceded that the evidence from Green's ankle bracelet placed Green at the scene of the murder, robbery, and Clemson Street shooting. Counsel acknowledged that Green was in possession of L.C.'s stolen phone. She argued the witness's testimony had numerous discrepancies and Sheran and James lacked credibility. Counsel argued that there was no evidence beyond a reasonable doubt Green shared Parsley's intent to murder Duncan. According to counsel, Green's moves could be tracked but his thoughts could not.

## PROCEDURE

Defendants were charged with the murder of Duncan. Green additionally was charged with the robbery of L.C. and possession of a firearm by a felon.

With respect to the murder, it was alleged that a principal personally and intentionally discharged a firearm within the meaning of Penal Code section 12022.53,

7

subdivisions (b), (c), (d) and (e)(1).[7]  A gang enhancement was alleged with respect to the murder and robbery.  With respect to the robbery, it was alleged Green personally used a firearm within the meaning of section 12022.53, subdivision (b).

It was alleged that Green suffered three prior convictions within the meaning of sections 667.5, subdivision (b) and 1203, subdivision (e)(4).  It was alleged Parsley suffered one prior felony within the meaning of sections 667, subdivision (a)(1) and 667.5, subdivision (b).

Green's pretrial motion for severance of the robbery charge from the murder charge was denied.

Defendants were tried jointly.

Defendants admitted the prior offenses.  Green pled guilty to being a felon in possession of a firearm (in order to avoid jurors' consideration of that count).

The trial court denied defendants' motion to exclude evidence of the Clemson Street shooting as irrelevant and unduly prejudicial.  Over objection, the court concluded that James's testimony reporting Green's statement implicating both Green and Parsley in the murder of Duncan was admissible.  Parsley's request to impeach James with prior statements regarding a subset within the Playboys was denied.

During deliberations, jurors asked:  "If Hopeton Parsely is found guilty of 1st Degree murder and, Kevin Green is found guilty of aiding and abetting then, must Kevin Green be found guilty of 1st degree murder, or can jury still consider 2nd degree murder for Kevin Green?"  The court answered the question as follows:  "A finding of first degree murder as to one defendant does not bind you to first degree murder as to the other defendant.  The reason is that:  [¶]  'You must separately consider the evidence as it applies to each defendant.  You must decide each charge for each defendant separately.' "

Jurors convicted defendants as charged, except that jurors found the personal use of a firearm not true with respect to Green's robbery conviction.

---

[7]    Undesignated statutory citations are to the Penal Code.

8

Green was sentenced to 53 years to life for the murder.  He was sentenced to a consecutive five-year term for the robbery and a concurrent three-year term for being a felon in possession of a firearm (which he had admitted).  Parsley was sentenced to an indeterminate 90-year-to-life prison term including 10 years for the gang enhancement.

## DISCUSSION

Green and Parsley each raise numerous contentions, which we discuss seriatim.  As we shall explain, neither demonstrates that reversal of his criminal conviction is warranted.

### 1.  Sufficiency of the Evidence (Parsley)

Parsley argues that the record lacks sufficient credible evidence to support his conviction, echoing his trial counsel's argument to the jurors that James and Sheran lacked credibility.[8]  Parsley's argument is specious.

The undisputed standard of review dictates the result.  "[O]ur role on appeal is a limited one.  'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]  [¶]  'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' "  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Under this standard of review, it is the exclusive province of the jurors to determine the credibility of James and Sheran.  Although Parsley's counsel argued that

---

**8**     Parsley also argues that J.A. was not credible, but J.A. in no manner linked Parsley to the murder, Parsley's only conviction.

9

they were not credible based on their gang membership or affiliation, their prior crimes, and their motive to lie, jurors must have rejected counsel's argument. We may not reconsider the jurors' credibility determinations. " '[C]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 161-162.)

Once the proper standard of review is applied, overwhelming evidence supported Parsley's conviction. Parsley told James the details of the shooting corroborating Green's statement that Parsley was the shooter. Sheran observed Parsley shoot Duncan. She knew Parsley and could confidently identify him. Brittney placed Green and Parsley together in Green's car the evening of the murder, and Green's ankle bracelet showed that he was at the location of the murder. Further, M.J. testified that Parsley looked similar to the shooter. Parsley's challenge to the sufficiency of the evidence therefore lacks merit.

2. **People v. Chiu** *Does Not Require Reversal of Green's First Degree Murder Conviction (Green)*

Citing *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), Green argues that as an aider and abettor, he could have been convicted only of second degree murder, and his first degree murder conviction must be reversed or reduced. *Chiu* limits culpability when an aider and abettor is convicted based on a natural and probable consequence theory. As we explain, because Green was not convicted under that theory, *Chiu* does not assist him.

a. *Additional Facts*

Additional background on the jury instructions is necessary because they underlie Green's argument. In addition to instructions on accomplice liability, jurors were instructed on a conspiracy potentially involving defendants, Sheran, and Washington.[9]

---

**9** The instruction on aiding and abetting provided:

10

As part of the instructions on conspiracy, jurors were told: "To decide whether a defendant and one or more of the other alleged members of the conspiracy intended to commit murder, please refer to the separate instructions I'll give you on that crime. [¶] The People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder." Jurors were further instructed: "A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime. [¶] A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy." Jury instructions provided that Green is guilty of murder if among other elements the people prove that both "the defendants conspired to commit murder" and "murder was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit."

*b.* Chiu

In 2014, our Supreme Court held that "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*Chiu, supra*, 59 Cal.4th at pp. 158-159.) "Aiders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting

---

"To prove that defendant Kevin Green is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"1.   The perpetrator committed the crime;

"2.   The defendant knew that the perpetrator intended to commit the crime;

"3.   Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND

"4.   The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

11

principles. [Citation.] Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Id*. at pp. 166-167.)

The reasoning of *Chiu* applies to conspiracy when the conspiracy instructions allow jurors to find first degree murder based on the theory that first degree murder was a natural and probable consequence of a target crime other than first degree murder. (*People v. Rivera* (2015) 234 Cal.App.4th 1350, 1355-1356.) For example, when the target crime was discharging a firearm at an occupied vehicle, it was error to instruct jurors that they could find a defendant liable for first degree murder under a conspiracy theory if first degree murder were a natural and probable consequence of that target crime. (*Id*. at p. 1357.)

*c. Application Here*

Here, the only target crime for which Green could have been convicted of conspiracy was murder. Accordingly, under the instructions given, jurors could not have convicted Green of first degree murder based on the natural and probable consequence theory. To convict Green of first degree murder under the instructions given, jurors necessarily found that he "acted willfully, deliberately, and with premeditation."

Green does not argue otherwise. Instead, in his reply brief he "acknowledges that the trial court did not instruct the jury on a 'target' offense of the conspiracy other than murder." Thus, *Chiu*, which applies when a defendant was convicted of first degree murder based on the natural and probable consequences of a target crime, does not apply here.[10]

---

[10] Green cites other cases, but none of them are helpful. For example, in *People v. Sanchez* (2013) 221 Cal.App.4th 1012, the natural and probable consequences instructions included kidnapping and assault as possible target offenses. (*Id*. at p. 1020.) The case considered whether the jurors were required to be unanimous in their theory of guilt. *Sanchez* does not assist defendant because here there were no multiple target offenses from which jurors could have convicted defendant.

Green's contention that the prosecutor argued jurors could convict him of first degree murder based on the natural and probable consequence of a different target offense is not supported by the record. The prosecutor argued that the goal of the conspiracy was to "to go shoot somebody, to go commit a crime. But to do that you have to prove the existence of a conspiracy." As noted, under the instructions given, to prove the existence of a conspiracy required proving a conspiracy to commit a murder. The prosecutor further emphasized that defendants "were going out there on a mission and to kill someone and that was the object of the conspiracy," indicating that there was no target offense other than murder. Moreover, as Green acknowledges in the final summation, the prosecutor emphasized that the object of the conspiracy was "to commit a murder. The goal of the conspiracy is murder . . . ." The prosecutor did not urge jurors to convict Green of murder because it was the natural and probable consequence of a different target offense. The prosecutor's argument therefore does not support Green's argument that *Chiu* requires a reduction of the conviction from first degree murder to second degree murder.

### 3. *Severance (Green and Parsley)*

Green argues the court erred in denying his motion to sever the robbery charge from the murder charge and thereby denied him the right to due process and a fundamentally fair trial. Parsley argues that the denial of Green's motion for severance denied him due process. As we explain, the trial court properly joined the murder and the robbery charges.

The Legislature has expressed a statutory preference for joint trials. (*People v. Masters* (2016) 62 Cal.4th 1019, 1048.) Section 1098 provides: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials. In ordering separate trials, the court in its discretion may order a separate trial as to one or more defendants, and a joint trial as to the others, or may order any number of the defendants to be tried at one trial, and any number of the others at different trials, or may order a separate trial for

13

each defendant; provided, that where two or more persons can be jointly tried, the fact that separate accusatory pleadings were filed shall not prevent their joint trial."

"Because it ordinarily promotes efficiency, joinder is the preferred course of action. When the statutory requirements are met, joinder is error only if prejudice is clearly shown. [Citations.] [¶] ' "In determining whether a trial court abused its discretion . . . in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling.' " [Citations.] "The relevant factors are whether (1) the evidence would be cross-admissible in separate trials, (2) some charges are unusually likely to inflame the jury against the defendant, (3) a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges, and (4) one of the charges is a capital offense, or joinder of the charges converts the matter into a capital case." [Citation.] "[I]f evidence underlying the offenses in question would be 'cross-admissible' in separate trials of other charges, that circumstance normally is sufficient, standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 469-470.) " ' "If the court's joinder ruling was proper when it was made . . . , we may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' " ' " (*People v. Masters, supra*, 62 Cal.4th at p. 1049.)

Defendants do not challenge the trial court's determination at the time it denied Green's motion for severance. Instead, both defendants argue that the joinder resulted in a gross unfairness amounting to a denial of due process. Green focuses on the four factors listed above to support his argument that his right to due process was violated and the joint trial "resulted in actual prejudice." As we shall explain, defendants' arguments lack merit.

With respect to Green, none of the relevant factors supported severance or demonstrate that denying severance resulted in a due process violation. (*People v. Mendoza* (2000) 24 Cal.4th 130, 162.) The evidence identifying Green's location was cross-admissible, as was Brittney's testimony and the gang evidence. Both crimes were

14

gang-related, as "Shoreline" was called out as bait in one instance and in the other "Playboys" was called out to identify the gang committing the crime. The robbery was not likely to inflame the jurors even though L.C. was injured as Green was on trial for murder, a substantially more egregious crime. Jurors did not find Green guilty of the firearm enhancement with the robbery, suggesting that jurors based their decision on the evidence, not on their emotions. A weak case was not joined with a strong one as the evidence of both the robbery and the murder were strong, especially given that Green conceded he was at both locations at the time the crimes were committed. L.C.'s property was found in his apartment and Green himself confessed to his role in the Duncan murder. Finally, neither crime carried the death penalty. Contrary to Green's argument, none of the factors supported severing the robbery and murder trials.

Additionally, Green cannot demonstrate a violation of due process based on the entire proceeding because the evidence of both crimes was undisputed and overwhelming. As noted, Green's ankle bracelet positioned him at both crimes; L.C.'s property was found in Green's apartment; and multiple witnesses identified Green as the driver at the Duncan shooting following his and Parsley's "mission" on behalf of the Playboys. The joinder of the charges did not result in a gross unfairness amounting to a denial of Green's right to due process.

Parsley's argument that he suffered prejudice amounting to a denial of his right to due process borders on the frivolous. Parsley was neither charged with nor convicted of the robbery, and he demonstrated no link between the robbery and the murder for which he was convicted. The prosecutor's argument that *two* men robbed L.C. does not implicate Parsley, as the prosecutor did not argue Parsley was one of them. For the same reason, the prosecutor's statement that Green was with another "African-American male" did not implicate Parsley. The record belies Parsley's argument that the prosecutor linked him to the robbery.

Even if Parsley had been linked to the robbery, he was not charged with robbery and could not be convicted of it. Moreover, the assumed fact that Parsley committed a robbery does not tend to show that he murdered Duncan, the only crime for which he was

15

convicted. Further, as previously described in the first part of the Discussion, overwhelming evidence supported Parsley's murder conviction, including his own description to James, and Sheran's eyewitness observation of Parsley shooting Duncan.

### 4. *Gang Expert Testimony (Green and Parsley)*

Green argues that the gang expert testimony identifying him as a member of Playboys was hearsay, and its admission violated his right to confront witnesses and his right to due process. Green's premise is that allowing hearsay as the basis for an expert witness testimony does not survive *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). *Crawford* established that *testimonial* out-of-court statements offered against a criminal defendant are inadmissible unless the witness is unavailable at trial and the defendant has "a prior opportunity for cross-examination." (*Id.* at pp. 59, 67.) Parsley joins in Green's arguments.

Our Supreme Court recently explained: "When any expert relates to the jury case-specific out-of court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*People v. Sanchez* (2016) 63 Cal.4th 665, 686.)[11]

Although Sergeant Arenas and Officer Boyle testified to some case-specific facts identifying defendants as active gang members and describing their contacts with officers, any error in admitting their testimony was harmless beyond a reasonable doubt.

---

[11] Green states that admitting testimonial hearsay statements creates a risk of undue prejudice under Evidence Code section 352. Green fails to identify any specific *testimonial* hearsay statement. Nor does he analyze any specific testimony to argue that its prejudicial nature exceeded its probative value. Therefore, to the extent he is challenging the admission of the evidence under Evidence Code section 352, his argument lacks merit.

16

Other evidence overwhelmingly showed Green and Parsley were members of the Playboys and were acting in association with each other and on behalf of the Playboys when they killed Duncan. James testified that Green was a member of the Playboys known as Baby Skull. He testified Parsley also was a Playboy, and his moniker was Infant. As their names reflect, Green was the "big homie" and Parsley was the "little homie." James testified that the Playboys were enemies with the Shoreline Crips who claimed territory in Venice (where Duncan's family lived). James testified that going on a mission meant "trying to . . . catch the enemy slippin' [*sic*]." When a rival gang member was caught "slippin' " he would be assaulted or shot. James further testified that shooting Duncan was an effort to "earn some stripes" or build a reputation within the Playboy gang. James explained that when members of Playboys say "Shoreline," it is bait to lure a rival gang member into a trap.

Sheran testified that defendants were both gang members. She knew this because she was affiliated with the Marvins, and her gang was friendly with the Playboys. Brittney testified that Green was known as Baby Skull and Parsley was known as Infant. Brittney further testified that Green was a member of the Playboys. Thus, contrary to defendants' argument, the expert testimony was not essential to prove the gang enhancement.

### 5. *Vicarious Firearm Use Enhancement (Green)*

Green argues that with respect to the murder charge, the firearm use enhancements must be reversed because they violate equal protection and due process. Green emphasizes that he was not personally armed with a firearm and did not use a firearm. According to him, "[a] person who aids and abets the personal use or discharge of a firearm in a gang case is similarly situated to the aider and abettor in a non-gang case."

Green's premise lacks merit. As our colleagues in Division Four explained, an aider and abettor of a gang member is not similarly situated to other aiders and abettors of firearm users. (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 13 (*Gonzales*).) "Unlike other aiders and abettors who have encouraged the commission of a target offense

17

resulting in a murder, defendants committed their crime with the purpose of promoting and furthering their street gang in its criminal conduct." (*Ibid*.)

*Gonzales* further rejected Green's argument that section 12022.53 violated due process because it permitted increased sentences without a finding that the aider and abettor knew or intended that the homicide be committed by the use of a firearm. Instead, the appellate court held, the statute does not violate federal due process. (*Gonzales, supra*, 87 Cal.App.4th at p. 15.) We agree with *Gonzales*. (See also *People v. Hernandez* (2005) 134 Cal.App.4th 474, 483 [rejecting the argument that § 12022.53, subds. (d) & (e)(1) violate due process].)

### 6. *Admission of James's Testimony Reporting His Phone Call with Green (Parsley)*

Parsley argues that the court erred in admitted testimony from James that Green implicated Parsley in Duncan's murder.[12] Parsley argues that Green downplayed his own guilt and shifted culpability for the murder onto Parsley. Parsley further argues that James "was a patently unreliable witness."

#### a. *Additional Background*

James testified that a few days after Duncan was killed, he (James) spoke with Green on the phone, and Green reported the details of the Duncan murder. Green said that "they pulled up, they was trying to holla [*sic*] at a girl, and they banged 'Sholine' [*sic*] on my boy, and dude walked up to the car . . . . Next thing he knew, there was a gunshot." Green told James that he was driving. Green said that Infant, meaning Parsley, shot Duncan.

---

[12]    Parsley characterizes his argument as "error under the *Aranda-Bruton* doctrine." (Boldface & capitalization omitted.) *People v. Aranda* (1965) 63 Cal.2d 518 has been abrogated "to the extent it required exclusion of relevant evidence that need not be excluded under federal constitutional law." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 331, fn. 12 (*Greenberger*).) Additionally, under *Bruton v. United States* (1968) 391 U.S. 123 "a codefendant's hearsay statement *is* admissible 'if it falls within a "firmly rooted" hearsay exception or is "supported by a showing of particularized guarantees of trustworthiness." ' " (*People v. Arceo* (2011) 195 Cal.App.4th 556, 571.)

James also spoke to Parsley. Parsley told him that the victim said "he didn't bang" and walked up to the car. Parsley told James "the same thing Kevin [Green] told" James. Parsley told James that he (Parsley) "was doing the banging on Oscar [Duncan]."

*b. Analysis*

As we shall explain, the trial court properly admitted James's testimony reporting Green's statements even though they also implicated Parsley. Under Evidence Code section 1230 "a party may introduce in evidence, for the truth of the matter stated, an out-of-court statement by a declarant who is unavailable as a witness at trial if the statement, when made, was against the declarant's penal . . . interest." (*People v. Cudjo* (1993) 6 Cal.4th 585, 606-607.)

In *Greenberger, supra*, 58 Cal.App.4th 298, Division Four of this court held that a declaration against penal interest may be admitted in a trial involving more than one defendant if it "satisfies the [Evidence Code section 1230] statutory definition and otherwise satisfies the constitutional requirement of trustworthiness." (*Id*. at p. 334.) The court explained that, to determine whether the constitutional requirement of trustworthiness was satisfied, the "trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (*Ibid.*) "Clearly the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others. . . . [Citation.] However, the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures." (*Id*. at p. 335.)

The *Greenberger* analysis survives *Crawford, supra*, 541 U.S. 36 when as here the out-of-court statements are nontestimonial. (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 172 (*Cervantes*).) The reason is that the confrontation clause does not apply to out-of-court nontestimonial statements. (*People v. Arceo, supra*, 195 Cal.App.4th at p. 571.)

It is undisputed that Green's statements to James were nontestimonial. They were made during a phone call between gang members. No law enforcement personnel were

involved in the phone call, and the statements were not part of an official testimony.[13]  It also is undisputed that Green's statements were declarations against penal interest as defined in Evidence Code section 1230.  Parsley, however, argues that Green's statements to James were untrustworthy.  We disagree.

First, Green's statement to James bore substantial indicia of trustworthiness. Green spoke from personal knowledge.  He observed Parsley shoot Duncan.  Second, Green admitted his own conduct—driving Parsley to and from the scene of the murder. Far from deflecting blame, Green essentially admitted that he was an accomplice.  Third, the conversation was "between friends in a noncoercive setting," a particularly reliable circumstance.  In short, Green's statements to James were " 'so trustworthy that adversarial testing would add little to [their] reliability . . . .' " (*Cervantes, supra*, 118 Cal.App.4th at p. 177.)

Parsley urges this court to consider James's credibility.  However, the credibility of the in-court witness "is not a proper consideration." (*People v. Cudjo, supra*, 6 Cal.4th at p. 608.)  The hearsay rule does not implicate the credibility of the in-court witness. (*Ibid.*)  As noted, Parsley's counsel vigorously urged jurors to conclude James lacked credibility.

Finally, assuming that the challenged evidence should have been excluded, the error was harmless under both the state and federal standards.  In addition to Green,

---

[13]     *Crawford* offered the following explanation of the distinction between testimonial and nontestimonial statements:  "Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' [citation]." (*Crawford, supra*, 541 U.S. at pp. 51-52.) While the definition since has been honed, Parsley identifies no authority suggesting the statements at issue in this case could be characterized as testimonial.

20

Parsley also described the shooting to James. Parsley's description was consistent with Green's. Moreover, other evidence overwhelmingly supported Parsley's guilt as Sheran watched as Parsley shot Duncan. Sheran knew Parsley and could identify him conclusively. Any claimed error in allowing evidence of Green's statement to James was harmless beyond a reasonable doubt.

## 7. *Admission of Evidence of the Clemson Street Shooting (Parsley)*

Parsley challenges the admission of the evidence of the Clemson Street shooting. He argues it was inadmissible under Evidence Code section 352 and that its admission violated his right to due process. We consider both arguments even though he raised only the former in the trial court. (*People v. Partida* (2005) 37 Cal.4th 428, 435 [on appeal defendant may argue that admitting the evidence over his Evid. Code, § 352 objection "had the additional legal consequence of violating due process"].) Parsley argues that due process was violated because jurors would use the evidence as bad character evidence.

### a. *Additional Background*

Over objection, the trial court permitted the introduction of evidence of a shooting at an apartment building on Clemson Street at 11:06 p.m. on June 4—shortly after the Duncan murder. One witness identified a white car at the scene. Another witness heard a male yell, "Playboy Gangsters." Neither Parsley nor Green was identified at the scene. However, evidence from Green's ankle bracelet, which recorded his location, positioned Green at the scene of the shooting, and it was undisputed that Green was there.

### b. *Analysis*

Evidence Code section 352 allows a court "in its discretion [to] exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The prejudice referred to in section 352 is not the prejudice to a defendant that naturally flows from evidence tending to demonstrate a defendant's guilt, but rather the prejudice resulting from " 'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual

21

and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) We review the admission of evidence under Evidence Code section 352 for abuse of discretion. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

The probative value of the Clemson Street shooting evidence was weak as it was not indicative of any charged offense, did not link Parsley to the murder, and did not identify him as a person involved in the shooting.[14] For the same reasons the prejudicial value of the evidence was minimal as it did not link Parsley to any charged offense or enhancement. Parsley's argument that jurors would have understood this evidence as reflective of his bad character in violation of his right to due process lacks merit. The evidence was not reflective of Parsley's character because no witness identified him at the scene of the shooting, and no other evidence tied him to the Clemson Street shooting.

Assuming the evidence should have been excluded, Parsley fails to demonstrate he suffered any prejudice. As emphasized, no one identified him at the scene of the Clemson Street shooting. No link was established between that shooting and the Duncan murder. Moreover, there was overwhelming evidence that Parsley shot Duncan as described in part one of the Discussion.

---

[14]     Respondent argues that the evidence was relevant to defendants' motive and intent. According to respondent it "showed that appellants had the motive and intent to attack innocent victims who were not expecting a confrontation." (Boldface & capitalization omitted.) However, there was no evidence that the shooters attacked any person or that any apartment was occupied at the time of the shooting. Nor does shooting at an apartment building shed light on whether Parsley premeditated when he shot Duncan.

Respondent's reliance on *People v. Demetrulias* (2006) 39 Cal.4th 1, 18, is misplaced. In that case, evidence of a later assault was relevant to intent because the defendant presented evidence that he stabbed the homicide victim in self-defense. The evidence was central to rebut the claim of self-defense and to show that "defendant did not act in real or perceived self-defense." (*Id.* at p. 14.) In contrast, here the Clemson Street shooting was not relevant to rebut any defense, and did not shed light on Parsley's intent in shooting Duncan.

## 8. *Impeachment Evidence of James (Parsley)*

Parsley argues that he was denied a fair trial because the trial court limited his counsel's cross-examination of James, allegedly precluding him from showing that James was still a gang member at the time of the Duncan murder. We find no error.

During cross-examination, James testified that he stopped claiming Playboys around the time of this case. Parsley's counsel requested to cross-examine James regarding a subset within the Playboys called "Tiny Locs." According to counsel, a detective had notes suggesting that James spoke to J.N. who described a confrontation between "Tiny Boboo" on one side and James and Green on the other. The notes allegedly summarized a phone call from jail occurring on June 5, 2012. It was undisputed that the alleged incident occurred before the murder. Parsley's counsel argued that the evidence indicated that James was not trying to get out of gang life because he participated in the shooting "days before the murder."

In response, the prosecutor argued that Parsley's counsel had misunderstood the detective's notes, and that the notes did not refer to James as a shooter. The prosecutor argued that if there was impeachment evidence defense counsel should have obtained a recording of the call.

The trial court concluded the ultimate fact—whether James was trying to exit gang life—was of limited probative value. The court further concluded that cross-examination on this fact would result in an undue consumption of time and would be more prejudicial than probative. Parsley demonstrated no error.

As the trial court concluded, the "fact" that James was still in the gang at the time of the Duncan murder was of limited probative value. It was not inconsistent with James's testimony that he stopped claiming the gang around the time of this case. James could have both participated in a shooting shortly before the case and decided to stop his gang activity around the time of this case. Moreover, the proposed testimony was cumulative of Sheran's testimony that James was from Playboys. Further, although James's participation in gang activity was relevant to assess his credibility, jurors heard that he was a longtime gang member and had been convicted of assault with a deadly

23

weapon, multiple burglary counts, and other crimes. Moreover, James acknowledged that he recently had a gun, he smoked marijuana, and he went to gang headquarters with his son. Further, James testified, "I've did dirt before." James admitted that he had a tattoo on his chest that said "Playboy." The additional evidence Parsley sought to admit was therefore cumulative.

Even if the court erred in excluding the evidence suggesting Parsley was still a gang member around the time of the Duncan murder, the error was harmless beyond a reasonable doubt. As noted, the precise dates of James's gang membership was of limited usefulness as it did not bear on the undisputed evidence that both Green and Parsley confided in him, reporting the details of the Duncan shooting, which overwhelmingly supported Parsley's guilt. Even without James's testimony, Sheran's testimony overwhelmingly supported Parsley's conviction.

### 9. *M.J.'s In-court Identification (Parsley)*

Parsley argues that M.J.'s in-court identification of him was unduly suggestive. He further argues that as a result his conviction must be reversed.

M.J. did not identify Parsley in six-packs or in a live lineup. Without objection, at trial she identified Parsley as looking "similar" to the shooter.

Parsley forfeited his challenge to the in-court identification because he failed to object to this procedure in the trial court. (*People v. Elliott* (2012) 53 Cal.4th 535, 585-586.)

Parsley argues that competent counsel would have objected. His entire argument is as follows: "[A]ppellant asks the Court to examine his claim of prejudicial prosecutorial error under the rubric of ineffective assistance of counsel because competent counsel would have objected to the suggestive one-person lineup. (*Strickland v. Washington* (1984) 466 U.S. 668.)" This argument lacks merit.

" 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's

24

performance or lack thereof.  [Citation.]  Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833.) "Defendant's burden is difficult to carry on direct appeal.  We reverse on the ground of inadequate assistance on appeal only if the record affirmatively discloses no rational tactical purpose for counsel's act or omission." (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1148.)

Assuming Parsley's counsel should have objected to the evidence, Parsley demonstrates no prejudice from the claimed deficient conduct.  M.J.'s identification was cumulative of James's and Sheran's testimony, which overwhelmingly showed Parsley was the shooter.  Parsley admitted this to James, and Sheran watched Parsley shoot Duncan.  Moreover, Parsley's counsel emphasized the weakness of M.J.'s in-court identification during closing argument.  It is not reasonably probable Parsley would have obtained a better result had M.J.'s in-court identification been excluded.

### 10. *Sentence (Parsley)*

It is undisputed that the trial court erred in sentencing Parsley to a consecutive 10-year sentence for the gang enhancement.  "Penal Code section 186.22, subdivision (b) establishes alternative methods for punishing felons whose crimes were committed for the benefit of a criminal street gang.  Section 186.22, subdivision (b)(1)(C) (section 186.22(b)(1)(C)) imposes a 10-year enhancement when such a defendant commits a violent felony.  Section 186.22(b)(1)(C) does not apply, however, where the violent felony is 'punishable by imprisonment in the state prison for life.'  (Pen. Code, § 186.22, subd. (b)(5).)  Instead, section 186.22, subdivision (b)(5) . . . applies and imposes a minimum term of 15 years before the defendant may be considered for parole." (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004.)  Here, the trial court should have set forth a minimum 15-year term for parole eligibility because Parsley was sentenced to an indeterminate term.

25

With respect to Parsley, the trial court also should have stricken the one-year section 667.5, subdivision (b) enhancement rather than staying it.  The trial court imposed a five-year enhancement for a prior serious felony conviction.  The court may not impose both the one-year prison enhancement and the five-year enhancement for the same offense.  (*People v. Jones* (1993) 5 Cal.4th 1142, 1152-1153.)  The one-year punishment therefore must be stricken and the abstract of judgment modified accordingly.  (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1094, fn. 3.)

## 11. *Abstract of Judgment (Green)*

It is undisputed that Green's abstract of judgment does not correctly reflect the restitution fine.  Whereas the court imposed a fine of $13,920 under section 1202.4, subdivision (b)(2), the abstract of judgment reflects a $19,920 fine.  The abstract of judgment should be corrected to reflect the fine imposed by the court.

### DISPOSITION

With respect to Parsley, the judgment is modified to delete the 10-year sentence for the gang enhancement and instead impose a 15-year minimum for parole eligibility.  It is also modified to strike the one-year section 667.5, subdivision (b) enhancement.  In all other respects, the judgment is affirmed.

With respect to Green, the judgment is affirmed.  The trial court is directed to amend Green's abstract of judgment to reflect the restitution fine in the amount of $13,920.

The trial court is directed to forward certified copies of the amended abstracts of judgment for both Green and Parsley to the Department of Corrections and Rehabilitation.


FLIER, J.

WE CONCUR:



BIGELOW, P. J.                    GRIMES, J.

26